Filed 3/3/16  In re J.S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.M.,<br><br>    Defendant and Appellant. | A145892<br><br>(San Mateo County Super. Ct. No. JV83339) |

J.M. (Mother) appeals juvenile court orders denying her request for a bonding study, terminating her parental rights to her daughter, J.S. (Minor), and setting a permanent plan of adoption.  She contends the juvenile court abused its discretion in denying her request for a bonding study and that Minor would benefit from continuing her relationship with Mother.  We shall affirm the orders.

## I.  BACKGROUND

We are familiar with this case through our review of Mother's petition for extraordinary relief.  (*J.M. v. Superior Court* (July 13, 2015, A144929) [nonpub. opn.]; Welf. & Inst. Code,[1] § 366.26, subd. (*l*).)  We quote from our previous opinion:

---

[1] All statutory references are to the Welfare and Institutions Code.

## A.  Initial Petition

In September 2013, the San Mateo County Human Services Agency (the Department) filed a petition pursuant to section 300 on behalf of [Minor], then seven years old.  The petition alleged Mother had an ongoing pattern of exposing Minor to domestic violence present in Mother's relationships with her current and former boyfriends.  The petition also alleged Minor had been left unsupervised for hours at a time, that she walked to school alone, that she had been absent from school or tardy many times, and that the family's home was uninhabitable and hazardous.  Mother and her current boyfriend, E.N., had refused to accept services offered by the Department because they did not believe in government intervention.

According to the initial petition report, Mother had lost her parental rights to an older child in 2005, after she neglected her physically while she lived with her in the home of her then-fiancé, who operated a methamphetamine laboratory from his home.  The older child had been exposed to methamphetamine.

Minor tested positive for methamphetamine at her birth in 2006.  In 2011, Contra Costa County Children and Family Services received a referral stating that Minor was being exposed to domestic violence, that she and Mother had been staying at a domestic violence shelter, and that Mother had left the shelter and was living with a man and abusing substances.  Upon investigation, it appeared that Minor was staying with a friend and was adequately cared for at the time.  Mother refused any services for her substance abuse.

In 2012, Riverside County Child Protective Services (CPS) received a referral stating that Mother was a drug addict and was staying at a drug house in Richmond, and that Minor was living with a family friend in Riverside County with Mother's permission.  Before Minor began living with the family friend, Mother failed to get Minor to school regularly; Minor had missed 53 days of school the previous year.  According to the referral, Mother was "using drugs, homeless, and hopping from guy to guy," and in the previous year had been involved in a relationship marked by domestic violence with a

man who almost killed her. Riverside County CPS did not make contact with the family and closed the referral as inconclusive.

In January 2013, police officers were called to the family's home as a result of a disturbance. An officer described the home as uninhabitable. It had exposed wiring, holes in the walls, and a bathroom that did not appear to be functioning. There was a crack pipe on the table. The officer was not aware of any children in the home and did not report the matter to CPS.

In June 2013, the Department received a report that Minor had been seen playing in a playground by herself for several hours. Minor said she often walked around the neighborhood by herself. A social worker and a police officer visited the home. E.N. opened the window, and Mother approached the window. Mother was angry and asked, "[W]hat the fuck do you want and why is CPS in my business?" She denied that there were any hazards in the home and said she would not allow anyone into the home without a warrant. Mother acknowledged having been involved in violent relationships, starting with the father of her older child. The last man she was involved with before E.N. was extremely abusive, and Minor witnessed the abuse. Mother denied any current domestic violence with E.N. She admitted having abused methamphetamines in the past, but said the last time she had done so was when she was pregnant with Minor. She refused to take a voluntary drug test.

Mother said she was open to obtaining therapy for herself and Minor. The social worker gave her information about drug treatment clinics and resources for mental health services. She offered to show Mother the resource agencies in her community or take her to appointments, but Mother said E.N. would drive her.

In September 2013, the Department received a referral stating that Minor walked to and from school by herself and appeared to have to wake herself up and get herself ready for school. Staff members at Minor's school had asked Mother and E.N. several times not to allow her to walk to and from school unsupervised, but Minor continued to walk to school by herself at times, and she also walked to friends' houses by herself.

3

Minor told a social worker in September 2013 that, at the beginning of the summer, she had seen E.N. punch Mother's face and head and choke her by putting his arm around her neck. During that incident, Mother was crying and screaming for help and asking him to stop. E.N. told Mother to "Die! Die! Die!" while choking her. Minor was also crying, and she was so frightened that she ran underneath the bed to hide before going upstairs to be with her grandmother. Minor reported that Mother and E.N. argued a lot about E.N. not helping out with the cleaning. Minor referred to E.N. as "[D]addy."[2]

When asked if she had seen anyone else hurt Mother, Minor said that there was a "black man" who was mean to her and Mother. He would lock Minor in her room, and she could hear the man and Mother fighting and yelling and Mother screaming for help and crying. Minor was frightened for Mother's sake and did not know what to do.

The social worker spoke with Mother and E.N. in September 2013. Mother did not want to let the social worker into the home. She did not believe there was anything wrong with allowing Minor to walk alone. Mother and E.N. admitted the incident when E.N. punched Mother and put her in a choke hold, but said it was an isolated incident and would not happen again. When asked about the "black man" Minor had mentioned, Mother said he had beaten her up and broken her wrist. Mother also said that after a roommate died, she had left Minor with a friend and his girlfriend, who hurt Minor by slamming the door in her face. Mother beat up the girlfriend for hurting Minor. When asked if she had arranged therapy for Minor, Mother said she had someone in mind but was still setting it up.

The Department recommended that Minor remain in Mother's care based on the social worker's opinion that it was in Minor's best interest to remain with Mother unless Mother put her at risk of further abuse or neglect or continued to refuse to participate in services. Mother failed to appear for an initial petition hearing scheduled for September 13, 2013, and the hearing was continued to September 19.

---

[2] In June 2013, Mother reported that she had known E.N. for six or seven months and had moved in with him six months previously.

4

In a September 19, 2013 addendum report, the social worker stated that she had learned that Minor had not attended school since September 12, that Mother had told Minor's school principal that Minor would no longer be attending the school, and that Mother had not provided any forwarding school information.

## B. Detention

Mother failed to attend the September 19, 2013 hearing, and the court issued a protective custody warrant. Minor was then placed in foster care. In the detention report, the social worker informed the court that the Department had tried to arrange supervised phone calls and supervised visitation, but Mother was belligerent and confrontational. The foster mother tried to conduct a supervised phone call between Minor and Mother, but the call ended abruptly because Mother and E.N. were "inappropriate" toward Minor and the foster mother: Mother told Minor that Minor had been kidnapped and that Minor should listen only to Mother, and E.N. told Minor to bite, kick, and punch anyone who came near her. The following day, Mother called the Department and said she knew where Minor was being held and would come and get her. The report also noted that Minor had night terrors and anxiety, that she worried about Mother's welfare as a result of the domestic violence, and that Mother had not sought treatment for her. The juvenile court ordered Minor detained.

In October 2013, Mother sought and obtained a temporary restraining order against E.N. Mother alleged that E.N. had threatened her with a propane torch in the early summer, he had punched and choked her a few weeks previously, causing two black eyes and a sore jaw, he would not let her seek medical attention, he did not let her out of his sight, he did not allow her to attend the September 13, 2013 hearing, and he had told her that if she said anything about his conduct he would make sure Minor was never returned to her custody. Mother also alleged E.N. had run after Minor on several occasions. Once, when Mother attempted to intervene, E.N. ran toward Mother, punched her, put a pillow and blanket over her face and head, and said, "Die bitch, die," and "I'm going to kill you." Mother described instances of physical abuse of Minor: She alleged that approximately two weeks previously, E.N. had grabbed Minor by the jaw, squeezed

5

hard, and thrown her up the stairs, that he had choked Minor in early summer, and that on another occasion, he had grabbed Minor's hair and pulled hard.

### C. Jurisdiction and Disposition

According to an October 2013 jurisdiction/disposition report, Mother continued to refuse services offered by the Department because she did not believe in government intervention. The report detailed Minor's spotty record of school attendance, which included missing nearly two months of school between February 13 and April 9, 2013, when Mother was homeless and living "all over the Bay Area." As a result of Minor's many absences, she was academically about one year behind her grade level of second grade.

The report included additional details about the social worker's September 2013 conversation with Minor. Minor said she was responsible for getting herself out of bed and ready for school and that Mother and E.N. were usually still sleeping when she did so. Mother and E.N. slept a lot, and they were sometimes still asleep when Minor returned from school. Minor reported that Mother and E.N. fought a lot at night, and she described incidents in which E.N. physically attacked Mother. As Minor told the social worker about these incidents, she crawled under the bed. Minor also described "a black man" named Ed who had moved in without permission and had given Mother a broken arm. Ed would lock Minor in her room, and Mother would sneak into the room at night and give her food. Minor said Ed would hurt Mother and yell at her. Minor said she was frightened at this, and that "[n]ow every black man I see is him." Minor and Mother sneaked out of the apartment one night and ran away.

The social worker spoke with Mother in early October 2013, before Mother sought the restraining order against E.N. Mother acknowledged that she and E.N. had "disagreements," but denied that there was physical domestic violence. She also acknowledged that she and Minor had been held captive against their will by a man named Edward, that he abused her physically and sexually and broke her arm, and that Minor was locked in a bedroom down the hall but could probably hear her being abused.

6

After this event, Minor was afraid to leave Mother's side, and she began having nightmares and wetting the bed.

Mother said she was open to assistance from the government as long as it was "constitutional" and "warranted." She had recently enrolled herself and Minor in MediCal, but the long processing time had delayed the beginning of Minor's therapy. Mother had inquired about counseling services through Minor's school and through a program in San Francisco. Mother said she knew Minor's exposure to abusive relationships had affected her. She said she had used no drugs except marijuana since Minor was born and that she no longer used marijuana. She refused to consent to the social worker seeing the home and declined to sign the child services case plan.

The following day, Mother told the social worker she was in an abusive relationship with E.N. and had wanted to leave him for a long time. The social worker encouraged Mother to contact an appropriate program that would help her find a domestic violence center.

The jurisdiction/disposition report described a supervised visit that took place in October 2013, in which Mother repeatedly insisted someone had cut Minor's hair and asked Minor questions about her hair; Minor became so uncomfortable she wrote a note saying "Help." A visit between Mother and Minor that took place two days later went well.

A November 15, 2013 addendum report indicated that Mother had refused to submit to random drug testing and had not signed Minor's case plan. Minor told the social worker she liked living with the foster parents, but also that she felt safe with Mother. Mother's behavior during supervised visits and telephone calls had been appropriate and supportive.

Two additional addendum reports noted that the Department had continued to encourage Mother to participate in services and participate in random drug tests. However, she had not participated in any services other than supervised visits and phone calls. Mother continued to behave appropriately and supportively during visits. She had made living arrangements that were suitable for her and Minor.

7

Minor's therapist reported that Minor had symptoms suggestive of a severe attachment disorder and that she needed intensive treatment.

On December 23, 2013, the juvenile court declared Minor a dependent child.

### D. Supplemental Petition

Minor was returned to Mother on December 26, 2013. Mother had decided not to remain in the home in which she had planned to live with Minor, but hoped to move into another home soon. The social worker told Mother to keep him informed of her whereabouts, but he learned the next day that Mother had checked out of the hotel where she had told him she would be staying. He made inquires and located her at another motel the next day. Mother was hostile and verbally abusive to him in Minor's presence. The social worker told Mother to keep him informed of her residence, but Mother failed to do so.

A supplemental petition was filed on January 22, 2014, alleging Mother had failed to maintain contact with the social worker. (§ 387.) When the social worker spoke with her on the telephone on January 7, 2014, Mother refused to disclose Minor's whereabouts, she threatened the social worker, and she said she would not do anything the Department asked her to do. Mother failed to enroll Minor in school or engage her in counseling. Minor was found and removed on January 17, 2014. The juvenile court ordered Minor detained and ordered the Department to provide visitation and therapy for Mother.

The Department prepared a jurisdiction/disposition report in February 2014. Minor had told the social worker who was then assigned to the case that during the time she was with Mother, they had stayed at a couple of hotels and the homes of some of Mother's friends. Mother had not enrolled her in a school during that time. Minor said she did not want to go to school because she did not want to get taken away again. She did not see her therapist during that time, but she said she saw her Court Appointed Special Advocate (CASA) once.

Mother told a social worker her arrangements to lease a home to live in with Minor had fallen through because of the social worker's "crazy lurking behavior." She

8

had been unable to enroll Minor in school until she knew where they would be living; however, she said Minor had been scheduled to start school the Monday after she was removed from Mother, and that she had found a woman who would help Minor in the classroom because she was afraid to go to school. Mother said she was not trying to hide Minor and that the CASA had visited the home during the time Minor was with her. Mother said the cause of the dependency was E.N.'s violence and asked why there was still a problem after she ended the relationship. She had agreed to drug testing and therapy in order to have Minor returned to her care, but believed those requirements were unrelated to the reason Minor was initially detained.

Minor's therapist told the social worker she had been trying to reach Mother unsuccessfully for almost two weeks. Mother had been told the therapist needed consent forms to be signed in order to proceed with treatment, but Mother had not provided the necessary signatures.

The report also noted that Mother and Minor are "clearly bonded to one another and display their love and affection." Mother's early life had been difficult, but she had "demonstrated her sobriety, utilized the necessary services, and provided for her child's needs. The mother managed to terminate the abusive relationship that she was recently involved in and file a restraining order to protect herself and the child."

The juvenile court sustained the allegations of the supplemental petition on February 20, 2014, ordered Minor removed from Mother's custody, and ordered reunification services for Mother pursuant to the case plan prepared by the Department. Those services were to include parenting classes, a psychological evaluation, counseling or psychiatric therapy, a substance abuse assessment, random drug and alcohol testing, a domestic violence victims' support group, and visitation with Minor. A psychological evaluation was ordered for Minor. The case plan required Mother to obtain and maintain a stable and suitable residence for herself and Minor.

### E. May 2014 Interim Review

In a May 2014 interim review report, the Department noted that Mother had missed three visits with Minor during May. She was frequently late for her visits.

9

During visits, Mother was engaged, nurturing, and attentive to Minor's needs, and she was calmer than she had been on earlier visits.

Mother had recently reported that she had become homeless, and the social worker had given her resources to seek shelter housing. Mother had missed two appointments for a psychological evaluation and had not responded to the social worker's request that she provide dates she would be available. Mother had never been tested for alcohol and other drugs. Minor remained in foster care.

### F. Six-Month Status Review

The Department reported in August 2014 that Mother had moved to Marin County in late May in order to try to find housing. Mother had missed her visits during May, June, and part of July.[3] In June, workers who tried to call Mother found her number had been disconnected. In early July 2014, the social worker spoke to Mother, who said she had been hospitalized as a result of a kidney infection. Mother had a supervised telephone call with Minor on July 16 and visited with Minor on July 22. She had not provided any drug tests. It appeared that she had not sought counseling.

Despite Mother's failure to participate in any part of the case plan except visitation, the Department noted that Mother and Minor were bonded to each other and wanted to be together. The Department therefore recommended that Mother receive services for another six months to allow Mother time to "demonstrate her stability and sobriety." The juvenile court retained Minor in out-of-home placement and ordered reunification services for Mother.

### G. Twelve-Month Status Review

The Department submitted reports in November 2014 in connection with the 12-month status review. Mother had not followed through on referrals to drug testing between August and October. As of November 17, 2014, she had been tested for drugs only twice, producing negative results on October 29 and November 3, 2014. Mother

---

[3] On two of those occasions, Mother showed up for the visit; however, because she had not called to confirm she would attend, Minor was not transported to the visitation site.

had been given a telephone number to request counseling services on multiple occasions, but had not yet set up an appointment for therapy. Mother had been "somewhat" consistent in her visitation with Minor. She was engaged and nurturing with Minor during visits, although she continued to press Minor to say that she was sad or that something was wrong.

In late September 2014, the social worker had met with Mother, who said she had returned to San Mateo County and was living there with her new boyfriend, who was present at the meeting. Mother continued to question the need to participate in services; however, her boyfriend asked for a list of what needed to be done so he could help Mother complete her goals.

Since that time, Mother had completed a substance abuse assessment. She told the assessor that after Minor was removed in 2013, she "took a little meth a couple of times" because of the anguish of the loss. She was currently taking an opiate painkiller due to a broken rib she said she had recently incurred while "horsing around" with her boyfriend and others in her home; she denied that the injury was the result of domestic violence. The therapist who assessed her believed an intensive outpatient program would be appropriate, but that a referral would be impracticable due to Mother's "resentment about intervention, her apparent agitated paranoia, problems with transportation, and her limited cooperation regarding drug testing."

Mother attended a psychological assessment in November 2014 and expressed her outrage at the treatment she had received from the Department. The assessor terminated the evaluation prematurely because of what he saw as Mother's "attempt[] to sabotage the evaluation with her comments and behaviors." It was his impression that Mother's "dramatic, emotional, and erratic behaviors reflected maladaptive personality traits associated with the antisocial, borderline, histrionic, and/or narcissistic personality disorders."

In light of Mother's failure to comply with her case plan, provide evidence that she no longer used drugs, or maintain a stable living environment, the Department

11

recommended that reunification services be terminated and that a section 366.26 hearing be set to determine a permanent plan for Minor.

The CASA recommended that Minor remain a dependent of the court, and stated that until Mother began to participate in the case plan, she "would be extremely concerned about returning [Minor] to her care."

A contested hearing was set for January 22, 2015. A report prepared for the hearing noted that Mother had undergone a drug test on November 12, 2014 and the results were negative for drugs and alcohol, as had been the results on October 29 and November 3. She failed to appear for her other scheduled drug tests. Mother had been scheduled to have a psychological evaluation in early January 2015, but cancelled the appointment so she could be present when Minor had teeth extracted. A psychologist who evaluated Minor concluded she needed a safe, secure, and stable environment, and that it was "crucial to limit the extent of [her] exposure to any further conflicts, threats of violence or incidents of violence between her caregivers."

The hearing was continued, and took place on March 26, 2015. According to an addendum report the Department prepared before the hearing, Mother had been assigned to a therapist at her request, and said she had left several messages for the therapist, who did not return her calls. The social worker learned that the therapist was not accepting new patients, and she asked Mother to call the referring agency again and request a new therapist. With the exception of one occasion, Mother had continued to miss her drug tests.

Mother had been visiting Minor. She had been bringing her boyfriend to the visits, and she referred to him as Minor's "Daddy." She also had Minor speak with him during supervised phone calls. When the social worker told Mother she should not include her boyfriend in visits and phone calls because that time was for Mother and Minor only, Mother became angry and said her boyfriend was Minor's "Daddy."

Minor had been placed in a fost/adopt home. Mother sent her an email telling Minor she missed her, that she and "Daddy" were fighting for her, and that Minor should "fight too." She instructed Minor, "don't do anything except telling everyone you want

12

to go home to us.  Don't listen, don't do what anyone wants.  Just say you want your mom and dad because they love you and you miss them.  Prove to them you want to come home."  She also provided the cell phone numbers of herself and "Daddy."  [We end our quotation from our opinion in *J.M. v Superior Court*.]

After a contested hearing, the juvenile court found there would be substantial risk to Minor if she were returned to Mother's care, found Mother had not made substantial progress in her court-ordered treatment plan, terminated reunification services, and set a hearing pursuant to section 366.26 to make a permanent plan for Minor.  Mother petitioned this court for extraordinary relief, and on July 13, 2015, we denied her petition on the merits.  (*J.M. v. Superior Court* (July 13, 2015, A144929) [nonpub. opn.].)

## H. Request for Bonding Study and Section 366.26 Hearing

The Department informed the court in its report for the July 23, 2015, section 366.26 hearing that Mother had been visiting Minor in person once a month and speaking with her on the telephone once a week.  Although the juvenile court had told Mother not to involve Minor with the men in her life, Mother allowed her current boyfriend to speak to Minor during a telephone call in April 2015.  The fost/adopt mother reported that Mother had been "inappropriate" during other supervised telephone calls.  During a call in late June 2015, Mother cried and asked Minor, "Don't you want to live with me and daddy, are there no other kids there, aren't you bored[?]"  When Minor told Mother she would like to be with her, Mother asked questions about including "Daddy," and Minor then said she would like to live with both of them.  Mother told Minor she was sorry she could not stop crying, and Minor continuously reassured her by saying, "It's okay."

The report noted that Minor had no adverse effects after visiting with Mother.  She appeared happy during the in-person visits, but did not show any different emotion before or after the visits.  Within a few minutes of beginning the telephone calls with Mother, Minor wanted "to go and play."  The report also noted that Minor and Mother had a loving relationship with one another.

The fost/adopt mother had cared for Minor since early March 2015. Before this placement, Minor had struggled academically, but since then, she had begun to perform at or above grade level in all subjects. Minor told the social worker she enjoyed living with the fost/adopt mother and would like to continue to do so permanently if she could not live with Mother. The fost/adopt mother wanted to adopt Minor.

### 1. *Bonding Study Request*

Before the section 366.26 hearing, Mother filed a petition under section 388, asking the juvenile court to order a bonding study. According to the request, "A bonding study would provide the court with relevant evidence as to the connection between [Minor] and her mother and what would be in her best interest."

The Department opposed the request for a bonding study because it would delay Minor's permanency. The Department reported that Minor had told a social worker the fost/adopt mother treated her well and she felt safe in the home. Minor said she wanted to "go back with my mom," and reported that Mother had told her she would "go back with her soon" and that they could watch movies together and get a puppy.

Minor's counsel also opposed Mother's request for a bonding study. At the July 20, 2015, hearing on the motion, she pointed out that Mother had not participated in services offered in the past and questioned whether she would participate in the study. She also expressed concern that Mother manipulated and "guilt trip[ped]" Minor by asking her whether she wanted to return to her and that she made Minor call Mother's new boyfriend "[D]ad."

The Department's counsel informed the court that at a recent visit, Mother had given Minor a tablet containing an email account, telephone capacity, and GPS capacity, which would allow Mother to communicate with Minor and keep track of her. She acknowledged that Minor and Mother were bonded, but argued that the bond did not outweigh either Minor's need for permanency or Mother's lack of compliance with the Department's directives.

Mother argued she needed the bonding study before the section 366.26 hearing so that she could establish that she had a beneficial relationship with Minor. She asked for a

14

continuance of the section 366.26 hearing, which was scheduled for July 23, 2015, to complete the bonding study.

The juvenile court denied the request for a bonding study and confirmed the date for the section 366.26 hearing. In doing so, it acknowledged that Minor and Mother were bonded, and stated, "The issue is not just simply are they bonded, but does that type of bonding outweigh the need for permanence and the potential detriment to this child? [¶] I think it is too late in the game, based on all of the things that have happened. This latest thing with the tablet is just further evidence of . . . the fallout from this relationship. [¶] I am going to assume for purposes of the [section 366.26 hearing] that they are incredibly bonded and would entertain a stipulation to that effect. [¶] The whole issue for me is, does the existence of that bond outweigh the damage and the [fallout] from that bond?" The court went on to note that Mother would be on her best behavior during a bonding study, and that her action in giving Minor the tablet, which the fost/adopt mother would have to take away, was "a horrible thing to do to the child."

*2. Section 366.26 Hearing*

An addendum report for the section 366.26 hearing provided additional information about the tablet. The tablet had Wi-Fi, GPS, iCloud storage, a camera, and a phone, and was attached to an email account Mother had created for Minor. Minor told the social worker Mother had said she would pay for the Wi-Fi monthly. She appeared upset when the social worker told her Mother could have only supervised contact with her and the tablet would have to be returned.

Minor testified at the section 366.26 hearing that she enjoyed her visits with Mother. They would watch movies, play board games, and play hopscotch. If Minor was starting to get "hyper," Mother would breathe with her to help her calm down. Minor enjoyed spending time with Mother and wanted to continue to do so. She felt that visiting her every month was not enough and that she would like to visit her every week. She was sad at the thought that she might not see Mother again if she were adopted. She missed Mother and would like to continue speaking with her on the telephone if she were adopted.

Mother's counsel argued that guardianship, rather than adoption, should be the permanent plan because it would be detrimental to Minor to terminate her relationship with Mother.

The juvenile court terminated Mother's parental rights and ordered a permanent plan of adoption. In doing so, it acknowledged that Minor's feeling were "conflicted," but went on, "based on the information in the addendum [report] and the mother's behavior with the tablet, I think that any benefit to continued contact with [Mother] is outweighed by [Mother's] kind of narcissistic need to put herself and her needs first at the expense of her daughter's. [¶] I think we need to let this little girl off the hook."

## II. DISCUSSION

### A. Denial of Request for Bonding Study

Mother contends the juvenile court abused its discretion in denying her request for a bonding study to show that Minor would benefit from continuing her relationship with Mother (§ 366.26, subd. (c)(1)(B)) and in denying her request for a continuance of the section 366.26 hearing to allow time to carry out the study.[4]

"There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order. In addition, although the preservation of a minor's family ties is one of the goals of the dependency laws, it is of critical importance only at the point in the proceeding when the court removes a dependent child from parental custody (§ 202, subd. (a)). Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental

---

[4] The Department argues the request for a bonding study was properly denied because it was brought under section 388, which authorizes a parent to petition the juvenile court to change, modify, or set aside a previous order on the ground of change of circumstance or new evidence. (§ 388, subd. (a)(1).) As the Department points out, the request did not ask the court to change a prior order and did not show changed circumstances or new evidence. The case law makes clear, however, that a parent may request a bonding study and that the denial of such a request is reviewed for abuse of discretion. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197; *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) Whether or not section 388 was the proper procedural vehicle for the request, we shall review the court's denial of the motion on the merits.

16

custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339–1340, fn. omitted.) A court's ruling on a motion seeking appointment of an expert to conduct a bonding study is reviewed for abuse of discretion. (*In re Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1084 [no abuse of discretion in denying motion seeking bonding study where court had received social study report, review report, and supplemental report and would receive updated assessment before section 366.26 hearing].)

Our colleagues in Division Three of this court have explained that a bonding study when reunification services have been terminated is generally appropriate only in limited circumstances: "Bonding studies after the termination of reunification services would frequently require delays in permanency planning. Similar requests to acquire additional evidence in support of a parent's claim under [former] section 366.26, subdivision (c)(1)(A) [now subdivision (c)(1)(B)] could be asserted in nearly every dependency proceeding where the parent has maintained some contact with the child. The Legislature did not contemplate such last-minute efforts to put off permanent placement. [Citation.] While it is not beyond the juvenile court's discretion to order a bonding study late in the process *under compelling circumstances*, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*In re Richard C.*, *supra*, 68 Cal.App.4th at p. 1197, fn. omitted, italics added.)

We find no abuse of the juvenile court's discretion here. There was ample evidence in the record of the relationship between Mother and Minor: the Department's reports explained that Mother and Minor were bonded to each other, showed their love and affection, and wanted to be together. The court recognized that Mother and Minor were bonded, and indeed, stated that it would assume for purposes of the section 366.26 hearing that they were "incredibly bonded." The court explained that the issue before it at the section 366.26 hearing would be not whether Mother and Minor were bonded, but whether that bond outweighed "the damage and the [fallout] from that bond." In light of the information already before it through the Department's reports, the court could

17

reasonably conclude that another report was unnecessary. Bearing in mind that the focus at this stage of the proceedings was Minor's interest in permanency and stability (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1340), we find no abuse of discretion in denying the requests for a bonding study and for a continuance of the section 366.26 hearing in order to carry out the study.

**B. Beneficial Relationship Exception to Termination of Parental Rights**

Mother contends the juvenile court erred in not applying the section 366.26, subdivision (c)(1)(B)(i), exception to termination of parental rights because she and Minor share a loving bond and Minor would benefit from continuing a parent-child relationship with her.

Where reunification services have failed and a hearing pursuant to section 366.26 is held, the court must determine whether the child is likely to be adopted; if so, with limited exceptions, the court must terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (c)(1).) Under section 366.26, subdivision (c)(1), the denial of reunification services "shall constitute a sufficient basis for termination of parental rights" unless, inter alia, "(B) [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . ." The parent has the burden of proving the applicability of the beneficial relationship exception. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The *Autumn H.* court recognized that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) The beneficial relationship exception applies only when the relationship with the natural parent "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and

quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Only if "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed [is] the preference for adoption . . . overcome [so that] the natural parent's rights are not terminated." (*Ibid*.) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id*. at p. 576.)[5]

In the circumstances of this case, the juvenile court could reasonably decline to apply the beneficial relationship exception. Minor's early years spent with Mother had been marred by instability, inconsistent schooling, and exposure to domestic violence. She was living with a foster mother who wished to adopt her, she was happy and felt safe in her new home, and her academic performance had improved significantly during the time she was in her current foster home. Although Mother and Minor love each other and share a bond, Mother has been unwilling or unable to accept the limitations placed on her interactions with Minor and has engaged in actions that could undermine Minor's stability in her placement. In the 12-month review report, the Department noted that when Mother was told to stop including her new boyfriend in visits with Minor, she became angry and insisted he was Minor's "Daddy." Mother told Minor not to listen or cooperate with anyone and to say that she wanted to come home, and she gave Minor cell

---

[5] There is some conflict in the courts of appeal as to the proper standard of review of a juvenile court's finding on whether one of the exceptions to adoption applies. (See *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–577 [substantial evidence standard applies to finding on the applicability of beneficial relationship exception]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion but recognizing difference in standards not significant]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 [applying combination of both standards].) We agree with *Jasmine D.* that the practical differences between the two standards in evaluating the beneficial relationship exception are not significant. (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) On the record before us, we would reach the same result under either standard.

phone numbers for herself and "Daddy." After the juvenile court terminated reunification services, Mother allowed her boyfriend to speak to Minor during a telephone call. As the section 366.26 hearing approached, Mother cried during a call, asked Minor whether she wanted to live with her and "Daddy," and asked whether she was bored in her foster home with no other children around. Finally, a few days before the section 366.26 hearing, Mother gave Minor a tablet, equipped with an email account and GPS capacity, which could allow Minor to keep in touch with Mother without the involvement of the Department or the foster mother. This record supports the juvenile court's conclusion that Minor's need for security and stability and the negative effects of the interactions between Minor and Mother outweighed the benefit of continuing the relationship.

## III. DISPOSITION

The orders appealed from are affirmed.

_____
Rivera, J.

We concur:


_____
Reardon, Acting P.J.


_____
Streeter, J.